IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMIE EDWARD HOUSEKNECHT          :     CIVIL ACTION
                                  :
            v.                    :
                                  :
JOHN DOE, et al.                  :     NO. 06-4597


MEMORANDUM

McLaughlin, J.                                    August 28, 2009


          The plaintiff in this civil rights action is a former
inmate at Berks County Prison ("BCP") who is now serving a state
prison sentence in the Pennsylvania Department of Corrections.
The defendants are former BCP Deputy Warden Robert Nichols and
current BCP Deputy Warden Kristen Reichard.  The plaintiff claims
that the defendants violated his right to freely exercise his
religion under the First Amendment by denying him access to
religious services and Bible study classes while he was housed in
protective custody and by failing to provide him any adequate
alternatives by which he could practice his religion.  He also
claims that the defendants retaliated against him when he
complained about these alleged violations by removing him from
the prison's sexual offender group therapy program.

          The defendants have moved for summary judgment.  They
argue that any denial of access to religious services was the
result of the plaintiff's own choice to be housed in protective
custody, and that even in protective custody, the plaintiff

received adequate religious services.  They further argue that the plaintiff was not removed from the sexual offender group therapy program as retaliation for his complaints regarding his religious rights, but rather, because he failed to participate in the program as required.  The Court will grant the defendants' motion in part and deny it in part without prejudice.

I.   Factual Background[1]

Jamie Houseknecht entered BCP in January 2004.  At that time, he was detained pending trial on charges related to the indecent assault of a minor.  In December 2004, after having pled guilty to three charges, the plaintiff was sentenced to twelve to twenty-four years in a state correctional facility.  Deposition of Jamie Houseknecht 41-42 ("Houseknecht Dep."), attached as Ex. A to Defs.' Mot. for Summ. J. ("Defs.' Mot."); Sentence Orders from Berks County Court of Common Pleas, Defs.' Mot. Ex. C.

On January 4, 2004, the plaintiff was placed into protective custody.  Protective custody is a close custody classification intended to keep an inmate who feels that he may be in danger in the general prison population from interacting with that population.  It is standard operating procedure at BCP to permit an inmate who believes he may be in danger in the

_____

[1] On a motion for summary judgment, the Court considers the evidence in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

general population to elect to sign himself into protective
custody.  An inmate also may choose to sign himself out of
protective custody.  To sign in or out of protective custody, an
inmate must sign a form making such a request.  The plaintiff
requested to be placed into protective custody on January 4,
2004.  On that date, he signed a form making such a request.  He
did so because he was fearful for his safety due to the nature of
his charges.  The plaintiff was not harmed during his stay in
protective custody.  Houseknecht Dep. 46, 68, 71-72, 124-25;
Affidavit of Deputy Warden Kimberly M. Bergan ¶¶ 3-4, 6 ("Bergan
Aff."), Defs.' Mot. Ex. D; Admin. Segregation R., Defs.' Mot. Ex.
E.

     General population inmates at BCP are given access to
weekly formal worship services.  In the interest of safety,
protective custody inmates are not permitted to attend those
services.  Instead, protective custody inmates receive separate
chaplaincy services.  These services allow protective custody
inmates the opportunity to meet with a chaplain, to participate
in Bible study within the housing unit, and to receive religious
educational materials.  The inmate handbook given to all inmates
provides that, when an inmate is housed in protective custody,
"chaplaincy counseling will be provided only on the housing
unit."  During his deposition, the plaintiff acknowledged that he
received the handbook upon his entry into BCP, and that he read

about protective custody in the inmate handbook.  Houseknecht
Dep. 54, 68-71; Bergan Aff. ¶¶ 10-12; BCP Inmate Handbook 21,
Defs.' Mot. Ex. D.

During his stay in protective custody, the plaintiff
complained that he was not provided access to religious services
and certain religious media and materials.  The defendants have
attached to their motion nearly thirty "Inmate Communication
Forms" filed by the plaintiff with BCP.  A member of the prison
staff responded to each of these complaints.  One of these
responses explains:

> Generally, inmates that are in protective
> custody are not permitted to "mix" with
> inmates in general population . . . .
> Exceptions to this have been made for inmates
> who are required, by parole, to complete
> specific treatment programs, e.g.[,] sex
> offender group, and the group cannot, for
> practical reasons be run on the unit.

See Inmate Communication Forms, Defs.' Mot. Exs. F-G.  The
plaintiff has acknowledged that BCP staff would have difficulty
protecting protective custody inmates were they to attend formal
religious services with general population inmates.  Houseknecht
Dep. 123-25.

During his deposition, the plaintiff admitted that he
had regular, even daily, communication with an individual
identified as "Chaplain Paul," and that the chaplain regularly

brought reading materials to the inmates in protective custody.[2]
He also acknowledged that he was not unhappy with any of the
responses to his inmate communication forms.  The plaintiff also
admitted that although inmates in protective custody were not
permitted to hold gatherings inside inmates' cells, there was
nothing preventing him from sitting with other inmates and doing
his own Bible study in the unit day room.  At no time did any
member of the BCP staff inform the plaintiff that he was not
permitted to do so.  Houseknecht Dep. 94-95, 100-03, 148-49, 154-
56.

During his time at BCP, the plaintiff attended a sex
offender's therapy group which was administered by the
defendants.  On February 24, 2004, the plaintiff signed a
document entitled "Conditions for Participation in the Berks
Count Prison Treatment Phase of the Sex Offender Program."  By
signing this document, the plaintiff acknowledged, among other
things:  (1) that he was "required to actively participate in the
program"; (2) that he "must attend all sessions unless an excused
absence is warranted"; (3) that "[o]ne unauthorized absence from
a group session may result in . . . termination from the Sex

---

[2] This fact is corroborated by certain responses to the
plaintiff's communications with the prison warden, which indicate
that on various occasions, Chaplain Paul left additional reading
materials in the protective custody unit that had been requested
specifically by the plaintiff.  Other responses indicate that
Chaplain Paul went to the protective custody unit to speak with
the plaintiff in response to his request.

Offender Program"; (4) that he "must make whatever arrangements necessary" to assure that other work, interests, or responsibilities would not interfere with his attendance; and (5) that he agreed "to abide by any sanctions up to and including dismissal from the program . . . for violation of these requirements."  The plaintiff also acknowledged that he could be removed from the group "for administrative reasons unrelated to [his] conduct."  <u>See</u> Houseknecht Dep. 95-97; Defs.' Mot. Ex. H 2-3 (emphasis in original).

On October 24, 2004, the plaintiff was removed from the Sex Offenders Therapy Group.  Defendant Reichard has averred that the plaintiff was removed "due to his noncompliance with the treatment process, specifically his unwillingness to give definitive answers to questions about his offending behaviors . . . . He went on to state that he was addressing his sexual deviancy on his own through his religious beliefs and therefore did not need to do so in [the] group."  Defendant Nichols has averred that "[o]n the day Plaintiff was removed from the sexual offenders group, he voiced complaints that were improperly raised during group and to which he had already received a response" and that the plaintiff also "refused to participate in the group."  Defs.' Mot. Ex. I ¶ 20; <u>id.</u> Ex. J ¶ 8.

6

The plaintiff has admitted that he did not file any inmate communication forms complaining about the basis for his removal from the sexual offenders group.  After he was removed from the group, however, the plaintiff did continue to file inmate communication forms regarding his denial of access to religious services.  <u>See</u> Houseknecht Dep. 90-91; Defs.' Mot. Ex. G; Pl.'s Opp. Ex. B.

In an affidavit attached to his opposition to the defendants' motion, the plaintiff asserts additional facts in opposition to the documentary evidence presented by the defendants.  <u>See</u> Pl.'s Opp. Ex. A.[3]  In this affidavit, the plaintiff states that during his stay in protective custody, he was unable to attend "any formal religious services or bible study classes," and that the "only opportunity" available to him consisted of "one to two monthly informal meetings held between several protective custody inmates . . . which were split up on several occasions due to boisterous arguments over various issues."  He states that between January 4, 2004, and January 5, 2005, the protective custody units did not have religious volunteers or volunteer faith counselors visiting the units.  He admits that religious materials were available, including "a Bible, Our Daily Bread Devotionals, Monthly Periodicals/

---

[3] The plaintiff also submitted a "Concise Statement of Disputed Material Facts."  <u>See</u> Docket No. 78.  This statement, in conclusory fashion, disputes both factual and legal assertions.

Magazines, fiction novels, and study booklets/tracts on basics of christian belief system [sic] and receiving salvation." The plaintiff further states that he was not advised of the restriction that would be placed on his religious freedom prior to entering protective custody. Id. ¶¶ 3-8.

Regarding the sexual offenders therapy group, the plaintiff's affidavit states that on October 12, 2004, the defendants "aggressively confronted" him about a tattoo on his arm and the complaints he filed about his religious freedom. He averred that they told him that Christians do not tattoo themselves or engage in deviant sexual behavior. He stated that they also told him that because he wanted to "'act' so spiritual all of a sudden" and spend time trying to obtain religious privileges, he "obviously" was not taking his treatment seriously and should not come back to the group. He stated that he "always activel[y] and honestly participated" in the group and was "never disruptive, non-compliant with the treatment process, or resistant to accepting treatment." Id. ¶¶ 9, 12.

Finally, the affidavit states that in October 2004, he personally spoke to the BCP clinical supervisor about the defendants' retaliation against him. According to the plaintiff, the supervisor told him that his allegations would be investigated. Id. ¶ 10.

## II.   Discussion

The plaintiff argues that the defendants violated his constitutional rights under the First Amendment, and that they improperly retaliated against him when he complained of that violation by removing him from the sexual offenders therapy group.[4]

### A.   Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, a party moving for summary judgment must show that there is no genuine issue as to any material fact and that judgment is appropriate as a matter of law.  Fed. R. Civ. P. 56©.  The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once a properly supported motion for summary judgment is made, the burden then shifts to the non-

---

[4] As an initial matter, certain facts in the plaintiff's affidavit conflict with those in his deposition.  To the extent that they do, the statements in his deposition will control.  As the United States Court of Appeals for the Third Circuit has explained, prior depositions are more reliable than affidavits.  Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007).  Although it is not the case that a district court must disregard an affidavit whenever it conflicts with a prior deposition, when a party does not explain the contradiction between a subsequent affidavit and a prior deposition, it is appropriate for the district court to disregard the subsequent affidavit and the alleged factual issue in dispute, and the affidavit will not create an impediment to a grant of summary judgment based on the deposition.  Id. at 254.

moving party, who must set forth specific facts showing that there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  Id. at 247-48.

A plaintiff's allegations and denials, unsupported by facts of record, do not create an issue of material fact sufficient to defeat summary judgment.  See Fed. R. Civ. P. 56(e); Liberty Lobby, 477 U.S. at 248-49.  In addition, although pro se filings are entitled to liberal construction, the plaintiff must still set forth facts sufficient to survive summary judgment.  Haines v. Kerner, 404 U.S. 519, 520-21 (1972); Zilch v. Lucht, 981 F.2d 694, 695-96 (3d Cir. 1992).

B.   Denial of Access to Religion

The plaintiff argues that BCP's rule prohibiting protective custody inmates from attending formal religious services and Bible study classes, as well as its failure to provide alternative accommodations, violated his right to freely exercise his religion under the First Amendment.  The defendants respond that the plaintiff was aware of the restricted access to religious services when he chose to enter protective custody.  They argue that such restrictions are constitutional because they

promote a valid penological interest in protecting inmates and maintaining safety and security at the institution, especially as the plaintiff had other opportunities for spiritual fulfillment.

Convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987); Fraise v. Terhune, 283 F.3d 506, 529 (3d Cir. 2002). Inmates retain protections afforded by the First Amendment, including the right to freely exercise their religion. O'Lone, 482 U.S. at 348. Inmates must thus be afforded "reasonable opportunities" to exercise their religious freedom. Small v. Lehman, 98 F.3d 762, 765 (3d Cir. 1996) (quoting Cruz v. Beto, 405 U.S. 319, 322 n.2 (1972)).

As the Supreme Court has explained, however, although prisoners retain certain constitutional rights, this does not mean that these rights are not subject to restrictions and limitations. To the contrary, lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. Bell v. Wolfish, 441 U.S. 520, 545-46 (1979). The fact of confinement, along with the legitimate goals and policies of the penal institution, limit these retained constitutional rights to those rights that are not inconsistent with an inmate's status as a prisoner or with the legitimate

penological objectives of the corrections system.  Id. at 546;
Fraise, 283 F.3d at 530.

Whether an inmate's constitutional rights have been
impermissibly burdened is governed by the four-part test set
forth by the Supreme Court in Turner v. Safley, 482 U.S. 78
(1987).  To establish a free exercise violation under Turner, the
plaintiff would need to show that the defendants burdened the
practice of his religion by preventing him from engaging in
conduct mandated by his faith without any justification
reasonably related to a legitimate penological interest.  Turner,
482 U.S. at 89.

Turner instructs courts to weigh four factors when
applying this standard:  (1) whether the regulation bears a
"valid, rational connection" to a legitimate and neutral
governmental objective; (2) whether prisoners have alternative
ways of exercising the circumscribed right; (3) whether
accommodating the right would have a deleterious impact on other
inmates, guards, and the allocation of prison resources
generally; and (4) whether alternatives exist that fully
accommodate the prisoner's rights at de minimis cost to valid
penological interests.  Id. at 89-91; Fraise, 283 F.3d at 513-14.

In 2000, Congress passed the Religious Land Use and
Institutionalized Persons Act ("RLUIPA").  See 42 U.S.C.

12

§ 2000cc-1.[5]  RLUIPA provides further protections for prisoners in the free exercise context.  Under RLUIPA, a prisoner must first prove that the government imposed a substantial burden on his religious exercise.  <u>Washington v. Klem</u>, 497 F.3d 272, 277-78 (3d Cir. 2007).  If he does so, the burden shifts to the government to show that the regulation is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest.  42 U.S.C. § 2000cc-1(a)(1), (a)(2).

The Court will first address the plaintiff's claim under the standard imposed by <u>Turner</u>, to determine whether the restrictions on his religious rights bear a reasonable relationship to legitimate penological interests.  It will then analyze the plaintiff's claim under RLUIPA.

## 1.   <u>Turner</u>

The first <u>Turner</u> factor requires the Court to consider whether the restrictions on the plaintiff's religious rights bear a valid and rational connection to a legitimate and neutral

---

[5] Although the plaintiff did not specifically raise a claim under RLUIPA in his complaint, the Court must liberally construe the plaintiff's pro se pleadings and apply the applicable law, regardless of whether he has mentioned it by name.  <u>See</u> <u>Dluhos v. Strasberg</u>, 321 F.3d 365, 369 (3d Cir. 2003); <u>see also</u> <u>Gray v. Occidental Life Ins. Co. of Cal.</u>, 387 F.2d 935, 936 (3d Cir. 1968).  Accordingly, the Court will address the plaintiff's free exercise claim under both § 1983, which requires the Court to apply the <u>Turner</u> test, and RLUIPA.

objective.  Under this prong of the Turner inquiry, the Court
accords great deference to the judgment of prison officials, who
are charged with the "formidable task" of running a prison.
Sutton v. Rasheed, 323 F.3d 236, 253 (3d Cir. 2003) (quoting
O'Lone, 482 U.S. at 353).  The first factor is "foremost" in the
Court's analysis, in that a rational connection is a "threshold
requirement."  Id. (quoting Wolf v. Ashcroft, 297 F.3d 305, 310
(3d Cir. 2002)).

        The United States Court of Appeals has recognized that
the interest in maintaining security and order is a valid
penological interest that may justify restrictions on inmates'
constitutional rights.  To determine whether such restrictions
are reasonably related to that interest, the Court must take into
account the fact that considerations such as security and order
"are peculiarly within the province and professional expertise of
corrections officials, and, in the absence of substantial
evidence in the record to indicate that the officials have
exaggerated their response to these considerations, courts should
ordinarily defer to their expert judgment in such matters."
Hubbard v. Taylor, 399 F.3d 150, 159 (3d Cir. 2005) (quoting
Bell, 441 U.S. at 540 n.23).

        In his opposition to the defendants' motion for summary
judgment, the plaintiff explains that his denial of access to
religion claim is not based on his mere inability to attend

14

religious services and Bible studies with general population inmates, but rather, that BCP refused to provide protective custody inmates with separate religious services and worship opportunities that are equal to those provided to general population inmates.  See Pl.'s Opp. 6.  The question that the Court must consider, then, is whether the establishment of separate and heightened restrictions for inmates in protective custody furthers a legitimate penological interest.

The United States Court of Appeals for the Third Circuit has not directly addressed this question.  Other Courts of Appeals, however, have held that security concerns can justify limiting the rights of prisoners in protective custody.  See Taylor v. Rogers, 781 F.2d 1047, 1050 (4th Cir. 1986); French v. Owens, 777 F.2d 1250, 1256 (7th Cir. 1985); Allgood v. Morris, 724 F.2d 1098, 1100-01 (4th Cir. 1984); see also Hosna v. Groose, 80 F.3d 298, 305 (8th Cir. 1996).[6]

The Court concludes that, on its face, BCP's limitation of the religious rights of protective custody inmates passes Turner's rational relationship test.  The restriction is also

---

[6] These courts of appeals have also considered this question under the Equal Protection Clause, holding that unequal treatment among inmates is justified if it bears a rational relation to a legitimate penal interest.  See Williams v. Lane, 851 F.2d 867, 881 (7th Cir. 1988); Taylor v. Rogers, 781 F.2d 1047, 1049 (4th Cir. 1986).  Because the Court addresses whether the distinction is rationally related to a legitimate penological interest, it need not undertake a separate equal protection inquiry.

reasonable as applied to the plaintiff, who specifically requested to be placed into protective custody.[7]  It is reasonable for a prisoner who opts for more protective conditions to enjoy fewer amenities.

To the extent that the plaintiff argues that there were no formal religious ceremonies or formal classes for protective custody inmates, this too is reasonable.  Cf. Hosna, 80 F.3d at 305 ("Inmates who reside in administrative segregation have been generally identified as either being a particular danger to others, or being in particular danger from others.  Because of this, the security needs of this unit are heightened, and every inmate must be construed as a potential threat to every other inmate.").

Having concluded that there is a rational relationship between BCP's restrictions on religious worship and protective custody status, the Court now turns to the second Turner factor,

_____

[7] In Williams, the Court of Appeals for the Seventh Circuit concluded that the restrictions placed by the Illinois Department of Corrections on the religious rights of inmates in protective custody did violate their free exercise rights by providing them "inadequate and needlessly inferior alternatives that the inmates have to exercise their religious beliefs."  Williams, 851 F.2d at 878.  In that case, however, the Court of Appeals found it was "necessary" to understand the nature of the protective custody status at issue.  Unlike the protective custody offered to the plaintiff in this case, which prisoners may enter and leave upon their own volition, protective custody in Williams was neither "voluntary" nor "temporary," and protective custody inmates, at the determination of the Department of Corrections, might spend much of their sentence in protective custody.  See id. at 873-74.

which asks whether inmates have alternative means of exercising the constitutional right at issue.  In the free exercise context, the Court considers whether the inmate has other means of practicing his religion generally, not whether he has other means of engaging in any particular practice.  Sutton, 323 F.3d at 255 (quoting DeHart v. Horn, 227 F.3d 47, 55 (3d Cir. 2000) (en banc)).  Moreover, where other avenues remain available for the exercise of the inmate's religious faith, courts should be particularly conscious of the measure of judicial deference owed to corrections officials.  Id.

The plaintiff admitted, in his deposition, that he had regular communication with Chaplain Paul and that the chaplain regularly brought reading materials to the inmates in protective custody.  The plaintiff also admitted that although inmates in protective custody were not permitted to hold gatherings inside inmates' cells, there was nothing preventing him from sitting with other inmates and doing his own Bible study in the unit day room.  Nevertheless, the plaintiff contends that he was not provided "an alternative means to freely exercise" his religion and "receive spiritual fulfillment."  Pl.'s Opp. Ex. A. ¶ 4.  He admitted in his affidavit, however, that the protective custody unit did permit informal meetings and further acknowledged that religious reading materials were available, including a Bible and study booklets on Christian beliefs and salvation.  Id. ¶ 6.

17

In his opposition, the plaintiff explains that he is a Baptized Pentecostal Christian and believes that faithfully attending congregational services and Bible study classes is a central tenet to his religion and is "vital to a believer's life because it is at these services that believers are provided with their spiritual food."  Pl.'s Opp. 4.  The plaintiff also explains other ways in which attendance at congregational services and Bible study classes are an important part of his beliefs.  Id. at 4-5.

The Court must here defer to the penological interest in safety.  Given the purpose of protective custody, which is to segregate inmates who believe that other inmates pose a danger to them, the Court cannot require the prison to permit such inmates to attend formal gatherings with other inmates, whether those inmates are in the general prison population or in protective custody.  Even so, the plaintiff has admitted that the prison staff allowed informal gatherings of inmates, and that such gatherings were only "split up" when there were "boisterous arguments over various issues."  In addition, to the extent that the plaintiff complains about a dearth of religious volunteers or religious materials beyond those that were provided to protective custody inmates, Turner requires only that an inmate have alternate means of practicing his or her religion generally, and

not that an inmate have alternative means of engaging in any
particular practice.

The third and fourth <u>Turner</u> factors focus on the
specific religious practice or expression at issue and the
consequences of accommodating the inmate for guards, for other
inmates, and for the allocation of prison resources.  <u>Sutton</u>, 323
F.3d at 257 (quoting <u>DeHart</u>, 227 F.3d at 57).  As the Court has
explained, requiring the prison to provide formal gatherings for
protective custody inmates may pose security threats that would
require the presence of additional guards.  The Court also cannot
conclude that the provision of additional reading materials or
access to additional religious media programming can necessarily
be accomplished without significant cost.  The prison would be
required to screen such materials, and providing them would
potentially require the prison to face any number of
individualized requests.

Nevertheless, even to the extent that the prison might
accommodate certain specific requests by specific individuals at
de minimis cost, the Court concludes that the balance of the
<u>Turner</u> factors favors the defendants.  The restriction of the
plaintiff's religious rights due to his election to enter into
protective custody is rationally related to a legitimate
penological interest.

2.   RLUIPA

To prevail under RLUIPA, the plaintiff must show that his religious exercise has been substantially burdened by the challenged prison conduct.  As the United States Court of Appeals for the Third Circuit has explained, a substantial burden exists under RLUIPA where either (1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates; or (2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs. Klem, 497 F.3d at 277-78, 280.

The plaintiff has not established that he has suffered a "substantial burden" within the meaning of RLUIPA.[8]  There is no suggestion that the government has placed substantial pressure on the plaintiff to substantially modify his behavior or to violate his beliefs.  The plaintiff also has not established that he has been forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates.  The plaintiff elected to sign into protective custody.  Although he states in his affidavit that he was not aware of religious restrictions when he signed in, he

---

[8] Because the Court finds the lack of a substantial burden dispositive, it need not address whether the prison's regulations the least restrictive means of furthering a compelling governmental interest.

20

acknowledged in his deposition that he received and read the
inmate handbook, which advises that protective custody carries
with it restrictions on religious access.

The plaintiff has not established that he experienced a
substantial burden within the meaning of RLUIPA.  To the extent
that he has alleged a claim under that statute, the Court will
grant summary judgment.


C.   Retaliation

The plaintiff claims that he was retaliated against
because of his complaints regarding denial of access to religious
services.  The form of this alleged retaliation was his removal
from the sexual offender therapy group.  The defendants argue
that the plaintiff has failed to exhaust administrative remedies
for his retaliation claim, as required under the Prison
Litigation Reform Act ("PLRA") and that his retaliation claim
fails on the merits.


1.   Exhaustion

Under the PLRA, a plaintiff must exhaust his
administrative remedies before filing a complaint in federal
court.  The PLRA does not require exhaustion of all remedies.
Rather, it requires exhaustion of such administrative remedies
"as are available."  42 U.S.C. § 1997e(a); Brown v. Croak, 312

F.3d 109, 111 (3d Cir. 2002).  To fulfill his duty of exhaustion,
an inmate must substantially comply with the administrative
remedy scheme.  <u>Nyhuis v. Reno</u>, 204 F.3d 65, 73, 77-78 (3d Cir.
2000).  Failure to exhaust administrative remedies is an
affirmative defense that must be pled and proven by the
defendant.  <u>Brown</u>, 312 F.3d at 111.

        The defendants argue that the plaintiff did not exhaust
administrative remedies because he did not file a formal
grievance related to his retaliation claim.  The plaintiff does
not dispute this fact.  Rather, he argues that he should be
excused from filing a formal grievance because he communicated
with the clinical supervisor who informed him that his
allegations would be investigated.  To this end, he cites case
law from this circuit stating, for example, that the filing of a
formal grievance is not necessary when a prisoner's allegations
were fully examined and rejected on the merits by the "ultimate
administrative authority."  <u>Camp v. Brennan</u>, 219 F.3d 279, 281
(3d Cir. 2000).

        The defendants have the burden of proving their
affirmative defense, and of properly supporting their motion for
summary judgment on this basis.  They are not entitled to
judgment as a matter of law merely because the plaintiff did not
file a formal grievance.  The Court cannot tell, on the record
presented, whether or not the plaintiff substantially complied

22

with the administrative scheme.  The plaintiff claims that he
advised a clinical supervisor about his complaint and was told
that his allegation would be looked into.  He states that he was
"not advised" of the conclusions with regard to his complaint.
To the extent that his complaint was rejected, however, the
filing of a formal grievance was not necessary.  In any case, the
defendants have not met their burden of showing that no genuine
issue of material fact remains, and the Court will not grant
summary judgment on the plaintiff's retaliation claim on the
basis of failure to exhaust administrative remedies.


        2.   <u>First Amendment Retaliation</u>

        Retaliation for exercising a constitutionally protected
right creates an actionable claim under § 1983.  <u>Anderson v.
Davila</u>, 125 F.3d 148, 162 (3d Cir. 1997).  To maintain a
retaliation claim under § 1983, a plaintiff must show:  (1) that
he engaged in constitutionally protected conduct; (2) that prison
officials took an "adverse action" that would be sufficient to
deter a person of ordinary firmness from exercising his
constitutional rights; and (3) a causal link between the exercise
of his constitutional rights and the adverse action taken against
him.  <u>Mitchell v. Horn</u>, 318 F.3d 523, 530 (3d Cir. 2003) (quoting
<u>Allah v. Seiverling</u>, 229 F.3d 220, 225 (3d Cir. 2000)).  With
respect to the third of these criteria, if a prisoner

sufficiently establishes a causal connection, prison officials may overcome this element by demonstrating that the same action would have been taken in the absence of the protected activity. Rauser v. Horn, 241 F.3d 330, 333-34 (3d Cir. 2001).

Here, the defendants do not dispute that the plaintiff engaged in constitutionally protected conduct.  They dispute only the second and third elements of the plaintiff's retaliation claim.  They argue, first, that the removal of the plaintiff from the sex offender's group is not an action that would deter a person of ordinary firmness from exercising his constitutional rights.  Second, they argue that the plaintiff has no evidence to substantiate his claim that his complaints were a substantial motivating factor in his removal from the group.

The plaintiff concedes that his removal from the sexual offenders therapy group "generally" would not be an action that would deter a person of ordinary firmness from exercising his constitutional rights, even if done in retaliation.  He argues, however, that given the circumstances of this case, he has met the requisite standard.  He states that, at his Megan's Law hearing on December 1, 2004, the Commonwealth's expert witness testified that the plaintiff was a "sexually violent predator" with high recidivist potential, in part, because the plaintiff did not cooperate with and failed sex offender treatment at the prison.  The Court agrees with the plaintiff that removal of a

convicted sex offender from sex offender therapy can constitute "adverse action" within the meaning of the law of retaliation in such circumstances.

The defendants also argue that the plaintiff has not met the second prong of the test for retaliation because he was not deterred from exercising his constitutional rights.  In fact, he continued to utilize the inmate communication system.  As both district courts in this circuit and courts of appeals in other circuits have explained, however, the test for retaliation is an objective one; and although the plaintiff's actual response to the retaliatory conduct may provide some evidence of the tendency that conduct has to chill First Amendment activity, it is not dispositive.  See, e.g., Smith v. Mosley, 532 F.3d 1270, 1277 (11th Cir. 2008); Constantine v. Rectors and Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005); Eaton v. Meneley, 379 F.3d 949 (10th Cir. 2004); Neuberger v. Gordon, 567 F. Supp. 2d 622, 637 (D. Del. 2008); Lane v. Varner, No. 07-0177, 2008 WL 598165, at *2 (M.D. Pa. Feb. 29, 2008); Citizens For A Better Lawnside, Inc. v. Bryant, No. 05-4286, 2007 WL 1557479, at *5 n.5 (D.N.J. May 24, 2007).  In any event, the record does not reveal any inmate communication forms filed by the plaintiff after December 1, 2004, the date on which the plaintiff states he learned that his removal from the sexual offenders therapy group was a factor being considered at his Megan's Law hearing.

The third prong of the test for retaliation requires the plaintiff to establish a causal link between his constitutionally protected conduct and his removal from the sex offenders group.  The defendants argue that the plaintiff has no evidence to show that his complaints were a substantial factor in his removal from the sexual offenders therapy group.  To the contrary, Reichard and Nichols have explained that he was removed from the group due to his behavior.

The only evidence the Court has seen to account for why the plaintiff was removed from the sex offenders group is two interrogatory answers from Reichard and Nichols, which simply aver that the plaintiff was removed from the group for behavioral reasons.  They do not refer specifically to any "improper complaints" that he made during any therapy sessions; nor is there evidence showing how the plaintiff was disruptive or resistant to treatment.  The plaintiff, on the other hand, states that he actively discussed his sexual addiction and states that on numerous occasions Reichard made positive comments about the plaintiff's efforts to make progress in his treatment.

Earlier in this litigation, the Court denied a motion to compel discovery filed by the plaintiff with the caveat that it would consider whether additional discovery was necessary after having reviewed the defendants' motion and the plaintiff's opposition thereto.  Having done so, the Court is not prepared,

26

on this record, to grant or to deny summary judgment with respect
to the issue of causation.

Instead, the Court concludes that the plaintiff, who
bears the burden of proof with respect to the elements of his
retaliation claim, is entitled to additional discovery on the
issue of the defendants' motivation for his removal from the sex
offenders group.  The defendants shall produce, within thirty
days of this memorandum opinion, all notes, journal entries, or
communications regarding the plaintiff's involvement with the
sexual offenders therapy group.  The plaintiff may also, within
thirty days of this opinion, send additional interrogatories to
the defendants asking them to explain the specific episodes or
behaviors that are alleged to have motivated their decision to
remove him from the group.  The defendants shall then have twenty
days to respond to those interrogatories.

III.  Conclusion

For the reasons herein stated, the defendants' motion
for summary judgment on the plaintiff's religious access claim is
granted.  Judgment is hereby entered on that claim in favor of
the defendants.  With respect to the plaintiff's retaliation
claim, the defendants' motion is denied without prejudice as
premature.  Within thirty days of this memorandum opinion, the
defendants shall produce the discovery outlined herein, and the

plaintiff may send to the defendants interrogatories as described herein, to which the defendants shall have twenty days to respond.  Upon receipt of the defendants' responses to his interrogatories, the plaintiff shall then have thirty days to file a supplemental brief explaining whether, on the basis of the evidence presented, he believes any issues of material fact remain with respect to whether he can establish the causation element of his retaliation claim.[9]  The defendants shall then have the opportunity to respond to that brief.

An appropriate Order shall issue separately.

---

[9] The plaintiff need not file a formal motion to this effect.  It shall be sufficient for him to send a letter to the Court explaining whether any issues of fact remain in view of the discovery he has received.  The plaintiff shall include in this submission copies of the evidence on which he relies.